1                  IN THE UNITED STATES DISTRICT COURT

2                 IN AND FOR THE DISTRICT OF DELAWARE

3                            - - -

4
    ASTRAZENECA LP, ASTRAZENECA    :   CRIMINAL ACTION
5   AB, and ASTRAZENECA            :
    PHARMACEUTICALS LP,            :
6                                  :
                   Plaintiffs,     :
7                                  :
        vs.                        :
8                                  :
    SANDOZ INC.,                   :
9                                  :
                   Defendant.      :   NO. 15-1012 (RGA)
10

11                            - - -

12                          Wilmington, Delaware
                            Tuesday, April 5, 2016
13                          1:36 o'clock, p.m.

14                            - - -

15  BEFORE:  HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

16                            - - -

17  APPEARANCES:

18           McCARTER & ENGLISH, LLP
             BY:  DANIEL M. SILVER, ESQ.
19

20                   -and-

21

22

23

24                          Valerie J. Gunning
                            Official Court Reporter
25

1    APPEARANCES (Continued):

2
                    FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER,
3                   LLP
                    BY:  MARK J. FELDSTEIN, ESQ.
4                        (Washington, D.C.)

5
                                -and-
6

7                   FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER,
                    LLP
8                   BY:  RYAN P. O'QUINN, ESQ.
                         (Reston, Virginia)
9

10                       Counsel for Plaintiffs

11

12                  PHILLIPS, GOLDMAN, McLAUGHLIN & HALL
                    BY:  JOHN C. PHILLIPS, JR., ESQ.
13

14                               -and-

15
                    RAKOCZY MOLINO MAZZOCHI SIWIK LLP
16                  BY:  TARA M. RAGHAVAN, ESQ. and
                         PATRICK C. KILGORE, ESQ.
17                       (Chicago, Illinois)

18
                         Counsel for Defendant
19

20                               -  -  -

21

22

23

24

25

1                    **P R O C E E D I N G S**

2

3              (Proceedings commenced in the courtroom,

4    beginning at 1:36 p.m.)

5

6              THE COURT:  All right.  Good afternoon and

7    please be seated.

8              This is AstraZeneca versus Sandoz, Civil Action

9    No. 15-1012 or maybe some other number.  I'm not really sure

10   which.

11             Mr. Silver?

12             MR. SILVER:  Yes, your Honor.  Good afternoon.

13   Dan Silver, McCarter & English on behalf of plaintiffs.  I'm

14   join today by my co-counsel, Mark Feldstein and Ryan

15   O'Quinn, Finnegan Henderson.

16             THE COURT:  Okay.  All right.  Good afternoon to

17   you all.

18             Mr. Phillips?

19             MR. PHILLIPS:  Good afternoon, your Honor.  Jack

20   Phillips, Phillips Goldman, on behalf of Sandoz.  And with

21   me in the courtroom are Tara Raghavan and Patrick Kilgore of

22   Rakoczy Molino from Chicago.  Ms. Raghavan will be doing the

23   argument.

24             THE COURT:  All right.  Good afternoon to you

25   all.

1          And so actually the way this has come up, who do

2     we think is going first in this argument?

3          MR. FELDSTEIN:  We have not discussed --

4          THE COURT:  I guess actually we think plaintiff

5     is.

6          MR. FELDSTEIN:  We think plaintiff is too.

7          THE COURT:  Yes.  All right.  Okay.  So

8     Mr. Feldstein?

9          MR. FELDSTEIN:  Thank you, your Honor.

10         So, your Honor, I don't want to waste time going

11    over too much background, but just generally to give a

12    little bit of context, the patent at issue with Sandoz is

13    the '934 patent, which is the fifth of five patents in the

14    Orange Book for AstraZeneca's Zolinda product.  It's the

15    latest expiring patent. ███████████████████████████████

16    █████████████████

17         There are several other --

18         THE COURT:  And so as I understand it, the other

19    four patents give you exclusivity, at least as relates to

20    Sandoz, for another five years?

21         MR. FELDSTEIN:  Correct.  Until at least

22    July 2021.  And so there's nothing imminent about issues

23    with the '934 patent.

24         There were six other parties, six other generics

25    ████████████████████████ certified against the '934 patent.  Three

1    of them we are able to see their ANDAs before the 45-day

2    window was up and we did not sue those.  Three of them we

3    were able to see their ANDAs after filing suit and those

4    have been dismissed.  Those are -- Alchem, Dr. Reddy's

5    and Teva are the parties we never sued, and Olympic, High

6    Sun and Microlabs are parties who were sued but then

7    dismissed.

8              And so where we are today is that we had been

9    unable at Sandoz to agree pre-suit to access to their ANDA.

10   We had asked for certain terms.  The parties just did not

11   agree.

12             After suit, the they agreed to the restrictions

13   that we had proposed.  We saw their ANDA and we decided that

14   like the other six parties, it was not a good use of

15   resources to pursue the '934 patent against Sandoz, and

16   so we sought to voluntarily dismiss it with Sandoz's

17   approval.

18             THE COURT:  So if these other four patents take

19   you up to July of 2021, how much further does the '934

20   patent take you?

21             MR. FELDSTEIN:  With patent term adjustment, it

22   goes until 2030.

23             THE COURT:  Oh, okay.  And with these, just

24   generally, speaking generally, because there are I guess

25   these five or six other generics that one way or another

1    have not been sued notwithstanding the fact that they

2    certified against this '934 patent?  Either not been sued or

3    had the suit dismissed?

4            MR. FELDSTEIN:  There are six in that category.

5            THE COURT:  Six.  And so would I be correct to

6    assume that it's entirely possible that in 2021 or

7    thereabouts the FDA could give them approval because of the

8    expiration of all of the rest of these patents and they

9    could launch their product and do this without knowing

10    whether or not you're going to sue them?

11            MR. FELDSTEIN:  Potentially.  You know, there's

12    a lot of ifs between now and approval.  We don't know -- we

13    know the ANDA, each party's ANDA says what their proposed

14    product is.  None of them are approved.

15            THE COURT:  Right.

16            MR. FELDSTEIN:  And so that all has to happen to

17    see what the final product is.  And so it's unknowable now

18    what the final approved product, if there will be an

19    approved product, and what it would be.

20            THE COURT:  Right.  But it's entirely possible,

21    and after all, it's kind of the theory behind why you could

22    sue them over the, with the '934 patent right now, is if you

23    did that right now, you would be doing it on the basis of

24    whatever their ANDA says they're going to do.  And it seems

25    to me based on my experience with these things is, most of

1    the time what the ANDA says the party is going to do is what

2    the party, in fact, wants to do, and I think generally ends

3    up doing.  Right?

4              MR. FELDSTEIN:  Well, certainly, if it's the

5    molecule itself.  You know, they can't change what the

6    active molecule is.  But this is a formulation patent, and I

7    don't think there's any basis to predict that the current

8    formulation -- certainly, it's what they intend to do and

9    what they want approval for, and it's a statutory act of

10   infringement under 217(e)(2) to file that ANDA, but that

11   does not mean that that is what the product -- it does not

12   mean it will get approved and it does not mean it will be

13   approved as that.  They.

14             Can't change -- you're right, your Honor, they

15   can't change the active ingredient during prosecution of

16   their ANDA, but there's no limitation on the formulation in

17   the same way.

18             THE COURT:  All right.  And so presumably,

19   though, when they submitted their ANDA, they already knew

20   about the Orange Book patents so that to the extent that

21   they would try to design around them, they had that option.

22   Right?

23             MR. FELDSTEIN:  They for sure knew about the

24   Orange Book patents, your Honor.

25             THE COURT:  And so just to get back is, if, in

1    fact, let's -- you know, work with me here, but if, in fact,

2    these six companies persist in their ANDAs and they get FDA

3    approval when it comes to 2021, the way this would play out

4    for them is they launch their product and maybe they get

5    sued by you and maybe they don't.

6             MR. FELDSTEIN:  Well, they'll also have the

7    opportunity once they get tentative approval and they know

8    what their approved product is, will have the opportunity

9    then presumably to file a declaratory injunction action

10   based on an imminent launch if this patent --

11            THE COURT:  All right.  It's the same thing.  So

12   either you are suing them because they have launched or

13   you're suing them to prevent them from launching.  But in

14   2021 -- did I misunderstand?

15            MR. FELDSTEIN:  I'm saying the generic, once

16   they get tentative approval, which is not approval to

17   actually market, but the FDA will say, your product matches

18   FDA guidance, and once July 2021 patents, we will give you

19   final approval, but tentative approval much earlier.  They

20   are supposed to get it within three years.

21            And so once they know what their final

22   tentatively approved product would be -- that's not where

23   they are now.  None of them have tentative approval.  They

24   just filed.  Then they may be in a basis to come to

25   AstraZeneca and say, look, we have tentative approval.  We

1    can work this out or then we'll need to go to court over

2    what our now tentatively approved product is.

3            THE COURT:  And you're saying that the statute

4    provides for the generic to sue on the basis of the

5    tentative approval, you know, three years from now?

6            MR. FELDSTEIN:  What the statute provides is

7    that if we hadn't sued, the three parties that we did not

8    sue, they -- we did not sue them in the 45-day window, they

9    could file -- a statutory declaratory judgment any time

10   after 45 days.

11           THE COURT:  There's no time limit on those?

12           MR. FELDSTEIN:  No.

13           THE COURT:  I have learned that they could do

14   that.  I didn't realize that they could do that any time

15   from the end of the 45 days until, I don't know, the patent

16   expires.

17           MR. FELDSTEIN:  Right.  And for the generics who

18   were sued within the 45 days, it would just be a standard

19   declaratory judgment action, is there a case in controversy,

20   is there something imminent.

21           So there are two different categories.  The

22   category that never got sued has a statutory basis under

23   271(e)(2)(5) to sue for declaratory judgment.  The ones who

24   were sued within the 45 days, it would just be a standard

25   declaratory judgment action when there's imminence and a

1    case in controversy.

2         THE COURT:  And as a practical matter, those two

3    things would play out the same in terms of what would happen

4    in court?

5         MR. FELDSTEIN:  It's hard to say with -- yes.

6    Presumably, your Honor, they would be the same thing,

7    whether it's a party that's going under 271(e)(2)(5).  Once

8    they got through the door of the jurisdictional aspect, it

9    would be the same thing.

10        THE COURT:  All right.  Sorry.  Go ahead.

11        MR. FELDSTEIN:  Not at all.

12        So we tried to focus our resources, tried not to

13   waste the Court' resources by only suing where it makes

14   sense at the time.  Where we're at now with Sandoz is

15   AstraZeneca would like to dismiss its own claims.  We can't

16   do so unilaterally because they had already answered and so

17   we're moving to dismiss our claims since we don't want to

18   pursue them.

19        THE COURT:  And essentially you want to dismiss

20   your claims and essentially go back tots point where you

21   would have been had you seen the OCA, or the ANDA, I guess,

22   in the 45 days?

23        MR. FELDSTEIN:  Right.  We're trying to go back

24   pre-suit status quo where nobody has lost rights and nobody

25   has gained rights, and we're trying to go back.

1          Sandoz, as I understand it, does not mind

2   AstraZeneca's case being dismissed.  They just want it with

3   prejudice.

4          THE COURT:  Right.

5          MR. FELDSTEIN:  And that would be a loss of

6   rights to AstraZeneca that's not proper.

7          THE COURT:  And so I get that.  I mean I

8   understand what Sandoz wants.  And am I correct in thinking

9   that in a way, these are two separate things that are at

10  issue here?  One is what are the conditions, if any, that go

11  with you voluntarily dismissing or dismissing with court

12  approval your case, but what you do on that -- well, what

13  they do with regards to their counterclaims could be a

14  separate thing.

15         MR. FELDSTEIN:  For sure.

16         THE COURT:  I guess if yours is dismissed with

17  prejudice, that kind of moots their counterclaims.

18         MR. FELDSTEIN:  That may moot their

19  counterclaims.  But otherwise there are two separate issues

20  in one motion.  Together they have a combined effect if

21  granted of ending the case entirely, but there are two

22  separate motions.

23         THE COURT:  I notice you seem to be emphasizing

24  that point, that I must be giving out the signal that I

25  really would like to get rid of all my cases.  So just

1    because it ends the case entirely, you know, that does not

2    necessarily mean that the two are a package deal.

3                    MR. FELDSTEIN:  No.  They are timely together

4    because we're moving to dismiss and it's a proper time for

5    us to move to dismiss their claims for failure to state a

6    claim and lack of DJ jurisdiction, discretionary, and we,

7    the parties, were unable to agree on dismissal of

8    AstraZeneca's claims, and so they come up together.

9                    THE COURT:  All right.  So one thing Sandoz says

10   in its brief at page 10 was, it seemed to say that you,

11   AstraZeneca, had said you would not have sued them in the

12   first place had you seen their ANDA during the 45 days.

13   And that is then interpreting what you wrote in your

14   brief.

15                    Do you agree with that?

16                    MR. FELDSTEIN:  Yes.  There were three parties,

17   I explained to your Honor, we did not sue.

18                    THE COURT:  No.  I understand.

19                    MR. FELDSTEIN:  And they would have been in the

20   same boat.

21                    THE COURT:  All right.

22                    MR. FELDSTEIN:  Not where we would have devoted

23   the resources had we seen their ANDA pre-suit.

24                    THE COURT:  All right.  And so one of the things

25   that goes with your returning to the status quo is, and I

1    think Sandoz may have said this, too, but I didn't write

2    down the page, but part of going back to the status quo is

3    you would be reserving the right to sue them, you know,

4    five years from now if nothing else happened in the meantime

5    and everything continues on the course in which, the

6    direction that it's set right now.  Is that right?

7              MR. FELDSTEIN:  Right.  We wouldn't be giving up

8    the right to enforce the patent.  It's premature to do that.

9    It would be basically a judgment of noninfringement, which

10   is premature.  There has been only minimal discovery and no

11   expert reviews, and so it's a bit premature to concede in

12   any way or to adjudicate infringement, which is what

13   dismissal with prejudice would be, and that's why we think

14   it's improper.

15             THE COURT:  Okay.  So is there anything else you

16   want to say about you dismissing your case, because I think

17   I kind of got the general gist of that, but I'm --

18             MR. FELDSTEIN:  You know, other than, your

19   Honor, the standard under the rule that it's dismissal

20   without prejudice unless there's clear legal prejudice to

21   the opposing party, that being that they prepared heavily

22   for trial and things like that.

23             THE COURT:  Right.

24             MR. FELDSTEIN:  None of it should happen.

25             THE COURT:  The four factors that don't seem to

1    really be very applicable here.

2                    MR. FELDSTEIN:  Yes.

3                    THE COURT:  So let's talk about their

4    counterclaims for a minute.

5                    MR. FELDSTEIN:  Yes.

6                    THE COURT:  So you seem to have a number of

7    arguments about their counterclaims.  One is they don't

8    state a claim.  Okay.  I understand that argument.  But

9    another one is there's no case or controversy.

10                   MR. FELDSTEIN:  Under 271(a), your Honor, which

11   is what they've quoted.  They don't cite, but they've quoted

12   the language of 271(a) for direct infringement, make, use or

13   sell a product.  We sued under 217(e)(2), which is the

14   statutory act of infringement for filing the ANDA.

15                   The whole Hatch-Waxman scenario --

16                   THE COURT:  Did they just cite the wrong

17   statute, because they could, they could, after the 45 days

18   are up, as you've just said, they could sue you at any time

19   to --

20                   MR. FELDSTEIN:  Under a different provision,

21   yes.  But what they've cited in their noninfringement

22   is 271(a), which they themselves in their answer.

23                   And I have extra copies of it, in their answer

24   to the complaint --

25                   THE COURT:  Actually, I have a copy of it

1    myself.

2              MR. FELDSTEIN:  So if your Honor would turn on

3    page 4 to paragraph 12.

4              THE COURT:  I see paragraph 12.

5              MR. FELDSTEIN:  The second -- the second-to-last

6    line, Sandoz denies subject matter jurisdiction is proper

7    for any claims asserted against it under 35 U.S.C., 271(a),

8    (b) or (c).

9              And then they likewise say -- if your Honor

10   would turn to page 10.

11             THE COURT:  Page 10, yes.

12             MR. FELDSTEIN:  The sixth affirmative defense.

13   The Court lacks subject matter jurisdiction over any and all

14   claims asserted under 35 U.S.C. C 271(a), (b) or (c).

15             THE COURT:  But you are saying that you are not

16   bringing claims under 271(a), (b) or (c).  Right?

17             MR. FELDSTEIN:  Correct.

18             THE COURT:  You're bringing claims under 271(e).

19             MR. FELDSTEIN:  Correct.  The problem --

20             THE COURT:  So what is the point of them saying,

21   we deny anything under claims that you say, yes, we're not

22   even bringing them?

23             MR. FELDSTEIN:  Correct.  Because now we're

24   talking about their counterclaims.

25             Their counterclaim of noninfringement, if your

1    Honor looks on page 14 --

2              THE COURT:  Okay.  Getting there.  Yes.

3              MR. FELDSTEIN:  -- which is their, the operative

4    paragraph, the operative section of their Count 1.  It says,

5    the manufacture, use, offer for sale, sale, importation, et

6    cetera, is noninfringement.  They're quoting or paraphrasing

7    271(a), which they themselves, and your Honor has, I think,

8    held elsewhere, there is no jurisdiction on an ANDA case

9    under 271(a).

10             THE COURT:  So, but what we're talking about

11   here is if that was your only thing, I would let them amend,

12   cite the right statute.  Right?

13             MR. FELDSTEIN:  They can't come forward, we

14   believe, with what they have pled.  They've asked for leave

15   to amend, and if your Honor agrees that they have not pled a

16   claim, then they would need to amend.

17             THE COURT:  But they could?  I mean, in other

18   words, because -- well, I mean, I think what you are saying

19   is, to some extent, they've cited the wrong statute, the

20   basis for doing this, which seemed like a relatively trivial

21   thing to be having an argument over, because you could

22   always fix that kind of thing.  Right?

23             MR. FELDSTEIN:  It may not be impossible for

24   them to plead properly, but they have not done it now.

25             THE COURT:  All right.  And so that maybe

1  explains something, because impact, generally speaking, the

2  ANDA statute recognizes that they could bring, I think you

3  called them statutory counterclaims, on the '934, and

4  assuming that you have not already sued them on the

5  '934.

6           MR. FELDSTEIN:  Right.  We did -- there is a

7  provision that if the patent owner doesn't sue within

8  45 days under 271(e)(2)(5), the generic after 45 days can

9  bring a statutory-based declaratory judgment action.  That

10  does not apply here because they were sued within 45 days

11  because we hadn't seen their ANDA, and so they don't have

12  271(e)(2)(5) jurisdiction.

13           THE COURT:  But then they just go to the

14  declaratory judgment act.

15           MR. FELDSTEIN:  Correct.

16           THE COURT:  So I mean --

17           MR. FELDSTEIN:  And then there has to be a case

18  in controversy.

19           THE COURT:  Right.

20           MR. FELDSTEIN:  It's not a statutory basis.

21  They have to show that there's a case in controversy

22  and discretionary to the Court and whether or not to

23  take it.

24           THE COURT:  But isn't there a Federal Circuit

25  case called Novartis versus Teva that seems to make it seems

1    like under these circumstances there is a case or

2    controversy?

3              MR. FELDSTEIN:  I don't think where there's

4    approval that is five years away, that any case hold there's

5    a case in controversy.

6              THE COURT:  Well, Novartis versus Teva did not

7    talk about when approval was, did it?

8              MR. FELDSTEIN:  I don't think so.

9              THE COURT:  Have you read the case?

10             MR. FELDSTEIN:  I have, your Honor.

11             THE COURT:  Okay.  All right.  What else would

12   you like to tell me?

13             MR. FELDSTEIN:  On the counterclaims, you

14   know, just to make sure we've touched on them, there was

15   an error in their argument, in Sandoz's argument.  They are

16   saying, look, we did nothing different than what the

17   plaintiff did.

18             THE COURT:  Yes.

19             MR. FELDSTEIN:  Okay.

20             THE COURT:  That argument carries no weight with

21   me because I think you cited it, and I honestly -- I've said

22   something like it myself.  Just because you do something

23   wrong doesn't mean they get to do something wrong.

24             MR. FELDSTEIN:  Well, in fact, they were quoting

25   our prayer for relief.

1          THE COURT:  All right.  Even if they had been

2     quoting the right part, it wouldn't make any difference.

3          MR. FELDSTEIN:  So on the counterclaims, the

4     other point on their second counterclaims of invalidity.  To

5     plead invalidity, plead anything, you have to set forth a

6     plausible basis.  The only thing they say is it's invalid

7     under one or more statutory provisions.

8          THE COURT:  Right.  I read it.

9          MR. FELDSTEIN:  They cite the face of the

10    patent, including, but not limited to, the prior art on the

11    face of the patent, which is not real notice, and arguably,

12    isn't plausible.

13          They are suggesting that it's invalid over the

14    exact art that the Patent Office found the patent to be

15    valid over.  It's not that they are making some new argument

16    or some new references.  They cite without any additional

17    basis just the face of the patent.

18          Their notice letter, which came before the suit

19    started, started the suit, is supposed to include all of

20    their factual and legal bases for noninfringement.  There

21    was none for noninfringement.  That wasn't --

22          THE COURT:  Noninfringement?

23          MR. FELDSTEIN:  Excuse me.  I misspoke.  For

24    invalidity.  They had no basis for invalidity in their

25    notice letter.  They have not pled it, a plausible

1        invalidity claim either.  So that's all in just -- that cuts

2        to the bottom line on their invalidity counterclaim.

3                And I think we've touched most of the issues

4        related to your Honor's discretion not to hear a DJ action

5        under your authority not to.  And here I would just again

6        submit that, you know, we wouldn't have been in this

7        position if we had agreed and seen their ANDA pre-suit and

8        we could have avoided the hearing.  It's not a proper use of

9        a DJ jurisdiction to try to leverage it for settlement

10       value.  The courts have spoken on that issue.

11               And what --

12               THE COURT:  So I mean I understand in the

13       abstract the sentence you just said, but I'm not sure how it

14       applies here.

15               MR. FELDSTEIN:  Well, when we sought to dismiss

16       the case as a whole with Sandoz, they refused and they

17       maintained we were going -- our case had to be dismissed

18       with prejudice in view of their DJ action.  And so they were

19       trying to juice their DJ action to leverage settlement,

20       covenant not to sue or some other settlement, and they are

21       trying to use it for leverage to get more than where we

22       started pre-suit.

23               There's the timing issue that I've mentioned.

24       It's more than five years before anything could -- would

25       happen for them, before -- even tentatively imminent.  They

1    don't have tentative approval.  It is more than five years

2    before they could even theoretically launch.  Their product

3    could change in the meantime.  The patent landscape here

4    could change.

5         We have a trial with your Honor in 2018,

6    with the other parties who certified against all five

7    patents.  There's no reason why your Honor would need to

8    hear their declaratory action of either invalidity or

9    noninfringement in 2018 when they can't launch until 2021

10   at the earliest.

11        The last thing on that point, they're going to

12   point, as they did in their brief presumably, to public

13   interest.  There's no public interest here.  There are eight

14   or so other generics.  There's nothing public interest about

15   Sandoz getting approval.  And so in the context there's

16   no reason why this Court needs to hear their invalidity

17   attack now or consider their noninfringement position at

18   this time.

19        THE COURT:  All right.  Thank you,

20   Mr. Feldstein.

21        MR. FELDSTEIN:  Thank you, your Honor.

22        MS. RAGHAVAN:  Thank you, your Honor.

23        Preliminarily --

24        THE COURT:  And I just want to make sure,

25   Raghavan, as Mr. Phillips said?

1          MS. RAGHAVAN:  It's actually Raghavan.

2          THE COURT:  Okay.

3          MS. RAGHAVAN:  But that's okay.  I'm used to all

4    kinds of pronunciations.

5          THE COURT:  You say that's okay.  He's the one

6    who mispronounced it.  I don't know you, so --

7          MS. RAGHAVAN:  Yes.

8          THE COURT:  Wait.  Let me just see if I've got

9    it now.  Raghavan.

10         MS. RAGHAVAN:  Raghavan.

11         THE COURT:  Raghavan.

12         MS. RAGHAVAN:  Yes.

13         THE COURT:  Okay.  Got it.

14         MS. RAGHAVAN:  Thank you, your Honor, for your

15   time and consideration.

16         We're here on, as you know, on AstraZeneca's

17   motion to dismiss.

18         You are correct, that Sandoz has attempted and

19   has achieved a design-around with respect to the '934

20   patent.  This is why Sandoz is seeking dismissal with

21   prejudice of AstraZeneca's complaint.

22         AstraZeneca has admitted that had they received

23   Sandoz's ANDA information before filing suit, they would not

24   have filed suit.

25         THE COURT:  And I think Mr. Feldstein just said

1    the same thing again.

2              MS. RAGHAVAN:  Correct.

3              THE COURT:  So I think we are all on the same

4    page there.

5              MS. RAGHAVAN:  And the issue here is, Sandoz is

6    only seeking some amount of patent certainty.  We understand

7    what AstraZeneca's position is.  You have five years to

8    wait.  It's irrelevant.

9              Sandoz, under the Hatch-Waxman Act, has the

10   ability to seek patent certainty and has done so.  There

11   were two ways to do it.  Mr. Feldstein pointed it out.  The

12   first way, had they not sued, Sandoz would have evoked

13   271(e)(5), but having been sued, Sandoz evoked its right

14   under Novartis v. Teva.

15             So at this point, Sandoz has the ability to

16   file suit.  It does not matter that there's five years

17   between now and the time that Sandoz can get approval.

18   Under the relevant case law, jurisdiction exists on this

19   counterclaim.

20             THE COURT:  I forget.  Was Sandoz -- have I

21   given you a trial date on the infringement part of the

22   case?

23             MS. RAGHAVAN:  You have, your Honor.

24             THE COURT:  All right.

25             MS. RAGHAVAN:  It's April 11th of 2018.

```
 1              THE COURT:  Yes.  I don't care what it is.  I

 2   remember I've given out lots of trial dates and I just was

 3   not sure.  I had no memory whether you, in part, Sandoz had

 4   been part of it or not.  Okay.

 5              MS. RAGHAVAN:  Right.  So one of the reasons why

 6   Sandoz -- the only reason actually that Sandoz is opposing

 7   AstraZeneca's attempts to get rid of its complaint in all

 8   honesty is that Sandoz believes that it is entitled to some

 9   certainty.  And what is going on here is -- okay.

10              THE COURT:  Well, I'm sorry.  All right.  You do

11   agree as a premise that, because there are two different

12   things going on here, as I said, with your opponent, or we

13   talked.

14              One is AstraZeneca getting rid of its case and

15   it seems like everyone has agreed, we're happy for

16   AstraZeneca to get rid of its case, and that's kind of, in

17   some ways, that's immaterial to you as long as you can have

18   your counterclaims.  Right?

19              MS. RAGHAVAN:  To a certain extent, your Honor.

20   There are two options here that we see.

21              One, as you rightfully pointed out, if

22   AstraZeneca's claims are dismissed with prejudice, Sandoz

23   would be willing to let go of its counterclaims because it

24   would achieve some patent certainty and can move on.  But

25   what AstraZeneca is doing here is a two part approach.  It's
```

1    saying, we're going to ask you, the Court, to dismiss their

2    claims without prejudice, which will allow them, you know,

3    either tomorrow, three weeks from now, five years from now,

4    hang this patent over Sandoz's head.

5                    THE COURT:  Well, really not until five years

6    from now.

7                    MS. RAGHAVAN:  No.  They can do it at any time.

8    They could file for suit at any time.  They have shown that

9    they've done that.  They did not need to file suit at this

10   time.

11                   THE COURT:  If they don't file suit within

12   45 days, don't they lose the right to file suit until you

13   actually launch?

14                   MS. RAGHAVAN:  No.

15                   THE COURT:  Wait a second.  Do you agree with

16   that?

17                   MS. RAGHAVAN:  Yes.  The only thing that -- the

18   ability -- when you file within the 45 days, what that gives

19   them --

20                   THE COURT:  The 30-month.

21                   MS. RAGHAVAN:  A stay of 30 months.  But had

22   they chosen not to do that, they would just not have

23   achieved that 30-month stay.

24                   THE COURT:  All right.  Let me just check.

25                   Mr. Feldstein, do you agree with that?

```
 1                    MR. FELDSTEIN:  I think that's generally right.

 2                    THE COURT:  Okay.

 3                    MR. FELDSTEIN:  I think that --

 4                    THE COURT:  Okay.  All right.

 5                    MR. FELDSTEIN:  Thank you.

 6                    THE COURT:  You sometimes -- you know, and I

 7    apologize for interrupting.

 8                    Sometimes when somebody makes a point and I'm

 9    thinking, okay, this is an opportunity to tie it up whether

10    we have a dispute here or not, before you move on, I forget

11    it, and then you don't address it again.  Then later on I'm

12    saying, gosh, I wish I would have asked.  Okay.  So go

13    ahead.

14                    MS. RAGHAVAN:  So Sandoz's problem here is not

15    with the idea, as you know, that the complaint will be

16    dismissed.  It's AstraZeneca's terms because it would be

17    without prejudice.  We understand that other defendants or

18    other generic filers have agreed to that.  We don't know the

19    reasons for that.  They may have many more that we don't

20    know, and we don't venture to speculate on someone else's,

21    you know, understanding.

22                    THE COURT:  But the only reason why this is even

23    an issue is because the information that AstraZeneca would

24    usually have gotten, the two of you and worked out this

25    offer of confidential access, they did not get.  Right?
```

1    Once they got it, they very quickly said, okay.  We don't

2    want to go anymore.

3              MS. RAGHAVAN:  That's true, but if they hadn't

4    done that, we would have had the right to bring a 271(e)(5)

5    action.

6              THE COURT:  But you still got the right to

7    bring whatever -- your 271(e)(5) or declaratory judgment

8    is essentially the same thing, so if you dismiss their

9    case without prejudice, you have not lost anything, have

10   you?

11             MS. RAGHAVAN:  In our view, we have, because,

12   you know, we don't know what's going to happen with these

13   counterclaims.  The opportunity exists for this Court to get

14   rid of this, this case entirely by dismissing with

15   prejudice.  And we think that's the -- that the case law

16   supports that.

17             THE COURT:  So but if I told you, not that I'm

18   bargaining here, but if I told you I will let you proceed

19   under counterclaims, then you would agree, wouldn't you,

20   that there's no reason not to let AstraZeneca dismiss

21   without prejudice?

22             MS. RAGHAVAN:  Well, your Honor, AstraZeneca has

23   asserted a couple of arguments that would suggest they

24   wouldn't expect our counterclaims to stand.  There's no case

25   or controversy, so on and so forth.  We think they are

1      subject to attack.

2              So in our view, the proper course here

3      is dismissal with prejudice, and we think under the

4      Hoffman-La Roche case v. GenPharm, it provides an

5      analogous situation in which the Court determined that

6      it would have been inequitable to let the plaintiffs move on

7      with the ability to litigate when they, after finally

8      providing documents, they determined there was no reason to

9      sue.

10             THE COURT:  Okay.  Well, just hold on, Ms.

11     Raghavan.

12             MS. RAGHAVAN:  All right.

13             THE COURT:  Which case here?  Hoffman?

14             MS. RAGHAVAN:  Hoffman-La Roche v. GenPharm.

15             THE COURT:  All right.

16             MS. RAGHAVAN:  50 F. --

17             THE COURT:  I'm sorry.  I'm just looking for it

18     in the briefing here.

19             MS. RAGHAVAN:  Yes.

20             THE COURT:  District of New Jersey.  All right.

21             (Pause.)

22             THE COURT:  All right.  Go ahead.

23             MS. RAGHAVAN:  In our view, this case is very

24     instructive.  It has analogous facts.

25             GenPharm was sued by Roche, answered with a

1    counterclaim.  They produced some documents.  Roche decided

2    they were not interested in pursuing suit.  Similarly filed

3    for a motion under 41(a)(2).

4              The Court determined that it should be dismissed

5    with prejudice because in that case, like this one, Roche

6    decided it did not want to pursue the claim because,

7    frankly, Sandoz's product, like GenPharm's product here, did

8    not infringe the patents-in-suit.

9              THE COURT:  Well, and, you know, I have no way

10   of knowing that.  Right?  I mean, all I know is that when --

11   you may be entirely right, but that's just an unknown, and I

12   would submit actually unknowable to me as to why they are

13   not going forward.

14             What I know is based on what everyone agrees

15   here, which is, if they had gotten the information that the

16   statute envisions them getting within the 45 days, that they

17   wouldn't have filed suit.

18             MS. RAGHAVAN:  And --

19             THE COURT:  And so there was something that

20   prevented the normal -- I'm not saying it's your fault, I'm

21   not saying it's their fault, but this did not play out in

22   the normal way, which to me appears to be not clearly the

23   fault of one side or the other.

24             MS. RAGHAVAN:  But that's the same thing that

25   happened in Roche.  In that case, Hoffman-La Roche filed

```
 1        suit not just against GenPharm, but several other

 2        defendants, several other parties.  Some of the parties

 3        provided information ahead of time pre-suit and the cases

 4        were dismissed before the answer was even filed, similar to

 5        what they were describing with respect to, I think, DRL,

 6        Teva, and I can't remember what the third one was.

 7                    THE COURT:  It does not matter.

 8                    MS. RAGHAVAN:  Yes, it does not matter.

 9                    And in that case GenPharm provided information

10        after they answered, and similar to this situation, Roche

11        moved to dismiss.

12                    And so applying that case gets you to a

13        dismissal with prejudice, which is what the Court decided

14        there.

15                    And contrary to AstraZeneca's assertion, you

16        know, I know that they were talking about the Spring City

17        factors and how Sandoz has not shown claimed legal

18        prejudice.  In fact, Sandoz has, in fact, shown plain legal

19        prejudice.  Delay in a decision is expressly against the

20        Hatch-Waxman's intent, and it leads Sandoz to a rock and a

21        hard place.

22                    So at some point in the future they are going to

23        decide to file suit.  It could be at the worst possible

24        moment, at which point expenses will be duplicative of what

25        we've already done right now but also can be heightened
```

1    because you're under that speedy fact situation.

2              So in our view, Sandoz has plain legal prejudice

3    should this, AstraZeneca's motion be dismissed without

4    prejudice.

5              THE COURT:  Okay.

6              MS. RAGHAVAN:  And AstraZeneca has failed to

7    cite a single case in the Hatch-Waxman context, which is

8    what we're in right now.

9              As to Sandoz's counterclaims, I'm going to start

10   with the subject matter jurisdiction issue.

11             Teva v. Novartis clearly makes it clear that

12   Sandoz has, the Court has subject matter jurisdiction over

13   Sandoz's counterclaims.  Here, AstraZeneca listed the Orange

14   Book, or listed the '934 patent in the Orange Book like

15   Novartis did in Teva v. Novartis.

16             Sandoz filed an ANDA with a paragraph 4

17   certification to the '934 patent, again, in the Orange Book,

18   and AstraZeneca sued.  That's the end of the story.  Subject

19   matter jurisdiction exists.

20             As to AstraZeneca's reliance on whether Sandoz

21   submitted a counterclaim under 271(a), (b), (c) versus

22   217(e)(2), frankly, the language in the claim, as you

23   know -- let me take a step back.

24             If they bring suit under 217(e)(2), Sandoz has

25   the right as a party to file a counterclaim that addresses

1    their suit.  While they say that the language of -- that

2    appears in 271(a) is not in the actual count, their prayer

3    for relief does include the very language that is in

4    Sandoz's counterclaim.  You know, it's form over substance.

5    The fact that they are seeking a prayer for relief that

6    would prevent something under 271(a), (b) or (c), that's why

7    Sandoz put it in its counterclaim.

8              As to the point that no, no, no, Sandoz has

9    provided affirmative defenses under 271(a), (b) or (c), yes,

10   Sandoz definitely believes that any of AstraZeneca's claims

11   under 271(a), (b) or (c) do not have subject matter

12   jurisdiction.  The Court does not have subject matter

13   jurisdiction over those.

14             The fact that Sandoz has cited that language is

15   properly based upon the relevant case law.  Once you assert

16   217(e)(2), as this Court recognized in the IPI case from

17   2014, once there is an assertion under 271(e)(2), it's an

18   artificial act of infringement.

19             So what is the analysis that is conducted after

20   that?  It's a traditional patent analysis, including what

21   would be under 271(a), (b) or (c).  So the fact that Sandoz

22   put that language in its counterclaim is only reflecting

23   what the Court will do, which is address the issue under the

24   traditional patent analysis.

25             As for AstraZeneca's complaints about Sandoz's

1    counterclaims being insufficient, the standard, as you know,

2    under Rule 8(a) is a short claim statement of the claims

3    showing that the pleader is entitled to relief.  All that's

4    required is for Sandoz to provide fair notice of what the

5    claim is and what the crowns upon it rest.  AstraZeneca has

6    conceded that all they needed to do is to have adequate

7    notice to frame an answer.  Here, AstraZeneca clearly has no

8    notice and has the ability to frame an answer.

9            How do we know that?  AstraZeneca framed an

10   answer against, with respect to noninfringement six other

11   defendants on virtually the exact same terms.

12           THE COURT:  But the standard is not, you know,

13   can they actually in the real world, you know, frame an

14   answer.  It's more of an artificial thing because, yes, most

15   of the time you all know what you are talking about.  I

16   think part of what's wrapped in here is, do I know what you

17   are talking about?  And I don't know what you are talking

18   about, generally speaking.

19           So just because they can answer doesn't

20   necessarily, or even because they answered six other times,

21   presumably more or less exact same time, which I don't think

22   that really resolves much.

23           MS. RAGHAVAN:  Well, it does, your Honor,

24   because determining under a fault, determining whether

25   complaint states a plausible frame is context specific,

1    requiring the reviewing Court, that's you, to draw on its

2    experience and common sense.

3              If AstraZeneca was able to frame an answer that,

4    or frame an answer on counterclaims that are essentially

5    identical to Sandoz's counterclaims, how can AstraZeneca

6    conceivably say that it cannot frame an answer to Sandoz's

7    counterclaim?  It just does not make sense and it's totally

8    against common sense.

9              So to a certain extent we understand that maybe

10   you don't buy that AstraZeneca had not so great pleadings.

11   Two wrongs don't make a right.  We agreed with that.

12   However, the case they cite there -- first of all, Sandoz

13   believes its counterclaims are perfectly pled.  With respect

14   to noninfringement, all that Sandoz had to do is identify an

15   accused product, which it did, and show the absence of

16   evidence to prove infringement.

17             Why is that?  Because AstraZeneca always retains

18   the burden of proof on infringement.  So, frankly, Sandoz's

19   counterclaims are perfectly sufficient.

20             As to invalidity, AstraZeneca complains Sandoz

21   only identifies grounds for invalidity and states one or

22   more claims are invalid under 102 and points to the prior

23   art of record during prosecution of the '934 patent.  But,

24   again, AstraZeneca was able to frame an answer against three

25   other defendants.

1              Just as an example, your Honor, Hack notes,

2    Hack's counterclaims, I believe, state, the claims of the

3    '934 patent are invalid under one or more provisions of

4    35 U.S.C., Sections 101, 102, 103, 112, double patent and

5    other judicially created basis for invalidation.  What did

6    AstraZeneca do?  It denied those counterclaims.  Having done

7    so under Rule 11, that's warranted on Evans.

8              So their only excuse there is, well, you know,

9    those counterclaims not only had that patent, but four other

10   patents, so it just was not economic, or judicial efficiency

11   called for them to complain about Sandoz's counterclaims,

12   but not those other defendants.

13             It just -- common sense does not dictate that.

14   They were able to frame an answer against three other

15   defendants, they should do so here.

16             And the Elan/Lupin case in the District of New

17   Jersey confirms that that is the case.  Less specific

18   counterclaims have been upheld fine by the Court, this Court

19   as well as others.

20             Sandoz's counterclaims are fully properly pled.

21   As for their last point on whether or not to decline

22   exercise jurisdiction, where jurisdiction exists, as does

23   here under Teva v. Novartis, the Court should find it proper

24   to exercise jurisdiction because it actually serves the

25   objectives of the declaratory judgment act, which is set

1  forth in our briefing.

2          For all of those reasons, your Honor, this

3  Court should dismiss AstraZeneca's complaint with prejudice

4  and deny AstraZeneca's motion to dismiss on the other

5  grounds.

6          THE COURT:  All right.  Thank you, Ms. Raghavan.

7          MR. FELDSTEIN:  May I respond, your Honor?

8          THE COURT:  Yes.

9          MR. FELDSTEIN:  I will be brief.  Just hit a

10  couple of points on everything.

11          So I would point out sort of working

12  chronologically, Sandoz's counsel cited Hoffman-La Roche

13  from New Jersey as the basis for why AstraZeneca's complaint

14  should be dismissed with prejudice.

15          THE COURT:  Okay.

16          MR. FELDSTEIN:  In Hoffman-La Roche, the case

17  has proceeded farther.  There were summary judgment motions

18  pending.  And what the Court noted on page 372 of the

19  opinion, they noted that plaintiffs have admitted that

20  GenPharm's process of manufacturing, dot dot dot, does not

21  infringe.  And so we're -- that case was clearly at a

22  different stage.  We have not gotten that far here.

23  So Hoffman-La Roche really has no bearing on the present

24  facts.

25          Sandoz, regarding their counterclaim under

1   271(a), I think counsel had referred to a decision of your

2   Honor, maybe changed the letter, but I think it was IGI from

3   2014, IGI Laboratories versus Mallinckrodt.

4            THE COURT:  Right.  I saw that cited in the

5   briefs.  I didn't actually go back to read it though.

6            MR. FELDSTEIN:  So at issue in that case, your

7   Honor, were counterclaims, two different types of

8   counterclaims on the same underlying facts, but one under

9   271(b), which is induced infringement, and another under

10   271(e)(2), which is the Hatch-Waxman infringement.

11            Your Honor dismissed the 271(b) count, quoting

12   Texas versus United States for the proposition that a claim

13   is not ripe for adjudication if it rests on contingent

14   future events that may not occur as anticipated or indeed

15   may not proceed at all.

16            And so, your Honor, because there was the -- it

17   was only a statutory act of infringement under the filing of

18   the ANDA, under 271(e)(2), your Honor dismissed the typical

19   infringement count of 271(b), which is analogous to 271(a)

20   for direct inducement and maintained the 271(e) count.

21            And so IGI is consistent with what we're arguing

22   here, your Honor, that they can't plead a case under 271(a),

23   as your case held, and as their pleading said twice.  I

24   pointed those out to you in paragraph 12 and I think page 4.

25   I lost the page.  I apologize.

1    As far as the factual basis for a pleading, they

2    say notice, notice, notice.  It's not notice, notice,

3    notice.  It's sufficient facts to state a plausible case.

4    As your Honor, I think, suggested, there's no

5    way that you or we can pick up the paper and say, they've

6    established a plausible case.  They've just said, basically,

7    it does not infringe and invalid.  Those are not enough

8    facts to make plausible, which is the requirement, plausible

9    facts to establish that they have a basis for what they've

10   pled.

11   The last thing I want to raise, your Honor, they

12   cited to an Elan case from District of New Jersey to suggest

13   that the notice pleading was sufficient.  I realize I'm

14   going out of order.  But that Elan case, it considered the

15   fact that in New Jersey, there are local patent rules that

16   require shortly after the complaint to be filed, they

17   require all your proofs to be put forth and give notice

18   there.  That was one of the bases in New Jersey for maybe

19   allowing a questionable case to go forward.

20   Here in this district, Judge Stark, in TSMC

21   Technology versus Zahn, 2015 Westlaw, 661,364, addressed

22   Elan and said, and declined to follow it, because there are

23   no local patent rules that require similar disclosures in

24   Delaware.

25   So that's my response.  I would like to answer

1    any questions your Honor may have.

2              THE COURT:  I'm not sure.  I may have --

3              MR. FELDSTEIN:  And --

4              THE COURT:  Weld, hold on just a minute.

5              MR. FELDSTEIN:  Yes.

6              (Pause.)

7              THE COURT:  No.  The questions I have have

8    either become moot or I've asked them.

9              MR. FELDSTEIN:  Okay.

10             THE COURT:  So I think I'm good here.

11             MR. FELDSTEIN:  And I guess while I was

12   standing, I had one more point that came to mind, if I

13   might.

14             THE COURT:  Actually, you may sit down.

15             MR. FELDSTEIN:  I'm sorry?

16             THE COURT:  Never mind.

17             MR. FELDSTEIN:  No.  I am fine, your Honor.

18             THE COURT:  No, no, no.  Go ahead.

19             MR. FELDSTEIN:  I just want to respond to the

20   point that counsel made that because we answered other

21   parties, we were able to answer here.

22             THE COURT:  Yes.

23             MR. FELDSTEIN:  I don't need to respond then.

24             THE COURT:  I don't think you need to respond to

25   that.

```
 1              MR. FELDSTEIN:  Thank you, your Honor.

 2              THE COURT:  I can tell Ms. Raghavan wants to say

 3     something else.

 4              MS. RAGHAVAN:  I wanted to correct one issue.

 5     We did not cite the wrong statute in our counterclaim.

 6     There's actually no statute cited.  Just as a point, you

 7     know, we're not specifically asserting under the actual

 8     claim in 271(a).  It's more of a broader noninfringement

 9     claim.  Noninfringement counterclaim.

10              THE COURT:  All right.  Thank you.

11              Okay.  So here's what I get out of the briefing

12     that I read and your argument today, which is, as I've sort

13     of suggested, my take on why AstraZeneca did not get the

14     ANDA to an offer of confidential access at an earlier time

15     is that the parties had a genuine dispute on what exactly

16     the protective order-type conditions would be that would

17     control that access, and so therefore the procedure that the

18     statute specifically envisioned happening did not happen.

19     And as I've said, I don't think I can say it's one party's

20     fault or the other.  It just did not really work out.

21              And so AstraZeneca sued, and defendant Sandoz

22     did eventually answer.  And I think it was right after they

23     answered that they -- because I've lost track, but I did

24     write it down.  Hold on a minute.

25              All right.  So, yes.  Sandoz answered on
```

December 30th of 2015 and provided an ANDA, I think, on
January 15th, 2016.  And within five days of that,
AstraZeneca had reviewed the ANDA and proposed a stipulation
of dismissal without prejudice.

So it seems to me that the statute envisioned
that AstraZeneca would see the ANDA, and if it chose not to
sue, there would be no penalty for not doing so.  And so I
think absent some aggravating sort of conduct by
AstraZeneca, the proper treatment of their motion to dismiss
their complaint is to dismiss it without prejudice.

And I've been asked to consider, I think --
AstraZeneca cited considerations for applying the
four-factor test, which are, quote, "any excessive and
duplicative expense of a second litigation.  Two, the effort
and expense incurred by defendant in preparing for trial.
Three, the extent to which defendant's litigation has
progressed.  And, four, the claimant's diligence in moving
to dismiss," unquote, in page 7 of docket item 18, which is
AstraZeneca's brief.

You know, that standard seems to me to entirely
favor AstraZeneca here.  You know, there's essentially no
duplicative expense of excessive litigation because there
hasn't been any expenses in the first litigation.

There has been no preparation by defendant for
preparing for trial because we are at the exact beginning of

1    the case.

2              That's also the third factor, the extent to

3    which the pending litigation has progressed, which is, it

4    has progressed essentially nowhere.

5              And, four, the plaintiffs moving to dismiss,

6    which essentially was within five days of getting the

7    information that the statute envisioned them having, they

8    moved to dismiss.

9              So it seems to me that the plaintiffs' case

10   should be dismissed without prejudice, and so that part of

11   their motion I will grant.

12             The second part of the case, which has to do

13   with plaintiffs' motion to dismiss the defendant's

14   counterclaims, I'm going to first talk about whether I think

15   whether there's jurisdiction to hear Sandoz's counterclaims,

16   and I think the answer is, yes, there is.  And possibly

17   because of the fact that plaintiff filed a suit, we look at

18   this under the declaratory judgment act rather than the

19   specific ANDA statute.  But I do think this case, Novartis

20   versus Teva -- sorry, Teva versus Novartis, which is at

21   482 F3d, 1330, is pretty much dispositive of the question

22   of whether or not there is jurisdiction and there are, as

23   Ms. Raghavan addressed at least in part, five factors or

24   circumstances that the Court of Appeals mentioned as

25   supporting their justiciable controversy and for of the five

1    match up pretty well with this case.

2                First, AstraZeneca listed the '934 patent in the

3    Orange Book.  That's an exact match.

4                It is true, the Court of Appeals said that

5    conduct on its own may not be sufficient to establish an

6    article three controversy.

7                But then the second circumstance that the

8    Federal Circuit pointed out, the analogy here is that

9    Sandoz certified that it did not infringe the '934 patent,

10   or -- and the patent was invalid, which is an act of

11   infringement.  And so that's the exact same as in Teva

12   versus Novartis.

13               The third circumstance that the Court of Appeals

14   mentioned was the combination of three statutory provisions.

15   One, the civil action to obtain patent certainty.  Two, to

16   end the declaratory judgment provision.  And, three, the

17   purpose of the Hatch-Waxman Act.

18               And so maybe not in the exact same proportions

19   of the Court of Appeals opinion because of the fact that

20   we did have a suit filed here, the underlying thought of

21   the purpose of the Hatch-Waxman Act seems to be exactly

22   on point here, too, that if Sandoz wants to have a

23   determination of whether or not its ANDA infringes or

24   whether the patent is invalid, that's something they ought

25   to be able to obtain.

1              So the fourth circumstance is mentioned in Teva

2    versus Novartis, which is not here under the circumstances,

3    which is that there, there were a number of patents, and so

4    the plaintiff has already sued the defendant on one of them.

5    The defendant wanted to sue on some more of them.  That's

6    not analogous to what has happened here, because plaintiff

7    does not want to sue on any of its patents.

8              And then the fifth one was, I'm going to read

9    what it says in the Court of Appeals opinion.  The

10   possibility of future litigation that -- I'm sorry.  Well,

11   that -- we call it the plaintiff created by electing to

12   challenge the defendant's ANDA on only one of the patents is

13   a fifth circumstance contributing to the finding that the

14   defendant has a justiciable declaratory judgment

15   controversy.

16             So that's not exactly analogous here, because

17   the only patent that you are certified on is the one that

18   is now at issue.  Nevertheless, I think the case is to

19   me pretty convincing that there is a case or controversy

20   here.

21             In terms of the discretionary thing, should I

22   not hear this now because it's five years before defendant

23   can possibly launch, it is discretionary.  It seemed to me

24   one thing that's relevant to discretion is, I have a whole

25   bunch of other cases that are on schedule that have these

1    issues tried, and so why -- so from a judicial management

2    point of view, and you're always balancing risk of one kind

3    or another, but it's efficient to me to get Sandoz's case

4    decided at the same time as I get all of these other cases

5    decided.  You know, the risk is maybe if I put Sandoz off

6    another couple of years, the decision in the case that I

7    already have, maybe I find the patent invalid and Sandoz

8    wouldn't have to do anything now, or maybe the way I

9    construed the patent would make infringement, or the

10   noninfringement clear.  You know, there are things on both

11   sides, but I think that the fact that it's five years away

12   doesn't to me suggest that there isn't a justiciable

13   controversy that it would be proper and reasonable to decide

14   now.

15          So I'm not going to dismiss defendant's

16   counterclaim on any of those bases.

17          Now, the Rule 12(b)(6), on -- let me stop here

18   for a second.

19          Ms. Raghavan, is it your position that

20   essentially what you say in the counterclaim of, say,

21   invalidity, does that in any way limit you from

22   asserting any invalidity theory that you want down the

23   road?

24          MS. RAGHAVAN:  Your Honor, by identifying our

25   invalidity theory, we have also addressed 102, 103 as an

1    example.  And you're correct, that we could potentially

2    address invalidity theory.

3                    THE COURT:  I'm sorry?

4                    MS. RAGHAVAN:  Should I come up here?

5                    THE COURT:  Yes.  Your voice was going down.

6                    MS. RAGHAVAN:  Yes.  I have a quietish voice

7    unless I'm projected a little bit.

8                    The fact is, is Sandoz's counterclaims, like

9    many counterclaims you've seen in this court, include the

10   invalidity provisions, the fact of 102, 103, whatever it

11   is.

12                   Sandoz's counterclaims in our view, including

13   under what Senju v. Apotex, the case that plaintiffs had

14   cited, are completely proper.  It provides --

15                   THE COURT:  So I'm asking a much narrower

16   question.

17                   MR. RAGHAVAN:  Sure.

18                   THE COURT:  One of the things that, does it in

19   any way limit you from raising any invalidity you think of

20   in the next few months?

21                   MS. RAGHAVAN:  Probably not, but to a certain

22   extent, that would be allowed under, you know, any

23   invalidity counterclaims.  For example, when we plead

24   defenses --

25                   THE COURT:  Well, I mean, basically, you could

1    just say, counterclaim.  Your patent is invalid under 101,

2    102, 103, 112, and whatever other provisions I don't

3    regularly see, period, end of discussion, and you would be

4    able to do anything you'd like down the road.  Right?

5             MS. RAGHAVAN:  To a certain extent, true, but we

6    have contentions due on June -- in June this year, so that

7    should provide some limitation to that factor.

8             But, your Honor, in -- we've seen a lot of these

9    counterclaims and we've looked at all the cases that, you

10   know, plaintiffs have cited.  They do not provide much more

11   information than what Sandoz has provided, and we do believe

12   that that these counterclaims are sufficient, including

13   under the Senju v. Apotex standard.

14            Frankly, we were involved with that Senju case,

15   so we have an understanding very well of what those

16   counterclaims are required in the District of Delaware and

17   we feel that Sandoz's counterclaims are sufficient.

18            THE COURT:  Sorry.  The Senju case, I don't

19   think that was a case I decided right?

20            MS. RAGHAVAN:  Correct.  Correct.

21            THE COURT:  All right.  All right.  So I'm going

22   to say a couple more things and then we'll be done.

23            I mean, it's hard for me to know what's

24   reasonable to require somebody who is pleading a claim or a

25   counterclaim to put in their pleading.  You know, one could

1   say, for example, on noninfringement, we've got one patent

2   here, and Ms. Raghavan said earlier, Sandoz has designed

3   around it.  You would think that, and I have not -- I'm

4   sorry.  Did someone say the '934 is some kind of formulation

5   patent?

6          MR. FELDSTEIN:  Yes, your Honor.

7          THE COURT:  So you would think that Sandoz could

8   say, you know, the patent says, has ten percent led in it

9   and we had no led in our product and therefore we don't meet

10  any of the claims -- you know, independent claims have that

11  and we don't therefore meet any of the claims.

12          MS. RAGHAVAN:  May I respond to that?

13          THE COURT:  Yes.

14          MS. RAGHAVAN:  As when I was discussing earlier,

15  Sandoz does not have the -- Sandoz isn't responsible for

16  proving noninfringement.

17          THE COURT:  Right.  But when you bring a claim,

18  I mean, when you -- because you're now like the plaintiff.

19  You're a declaratory judgment plaintiff.

20          MS. RAGHAVAN:  Right.  Even as a plaintiff, all

21  Sandoz has to say that there's an absence of evidence.  In a

22  noninfringement context, that's all that is required,

23  because Sandoz never has the burden, whether it's a

24  plaintiff or otherwise.

25          THE COURT:  Yes.  So when you do your

```
 1    paragraph 4 certification, you're supposed to explain why

 2    you think it is that you think -- don't you give some

 3    reasons as to why you think you either don't infringe the

 4    patent or the patent is invalid?

 5              MS. RAGHAVAN:  Your Honor, that's correct.  A

 6    notice letter does provide that detailed basis, but the

 7    detailed analysis that is suggested by a paragraph 40

 8    certification is not what is required for a pleading.

 9              THE COURT:  No.

10              MS. RAGHAVAN:  Right.

11              THE COURT:  But there's a difference between no

12    analysis and a detailed analysis.  Right?

13              MS. RAGHAVAN:  Well, the analysis --

14              THE COURT:  Or there could be.

15              MS. RAGHAVAN:  There could be.  But the analysis

16    in a noninfringement sense is, we don't meet the

17    limitations, and that is all that is set forth essentially

18    in our counterclaim.  What is not present is we don't

19    infringe.  That's all that needs to be said and that's what

20    is in our counterclaims.

21              THE COURT:  All right.  Just as a matter of

22    curiosity, do you cite a case are in your brief that says,

23    we don't have to allege anything at all when we're saying we

24    don't infringe?  I guess in a way...

25              (Pause.)
```

1          MS. RAGHAVAN:  Sorry.

2          THE COURT:  That's all right.

3          MS. RAGHAVAN:  What we cited is that when

4    the burden of proof is on a party, in this case,

5    AstraZeneca --

6          THE COURT:  What page are you referring on?

7          MS. RAGHAVAN:  We're on page 15.  We cited the

8    Walker case to establish that Sandoz never had the burden of

9    showing anything other than identifying the accused product,

10   asserting that the product does not infringe now, or a

11   commercial market.

12         In this case, Sandoz referenced the notice

13   letter, so AstraZeneca had the ability to frame an answer

14   with respect to that.

15         And AstraZeneca in connection with six other

16   parties --

17         THE COURT:  Well, hold on, please.  Don't tell

18   me about the six other parties anymore.

19         MS. RAGHAVAN:  Okay.

20         THE COURT:  So, all right.  Your colleague wants

21   to say something.  I think it is his turn.

22         MS. RAGHAVAN:  Okay.

23         MR. FELDSTEIN:  Your Honor, I think counsel is

24   confusing burden of proof with pleadings.  There's no

25   question that Iqbal-Twombly applied equally to

1    counterclaims, and to suggest that someone can have a

2    declaratory judgment saying, we just don't do that is

3    exactly the opposite of Iqbal and Twombly and that's not the

4    law.  And Judge Robinson's Senju decision, which counsel

5    referred to and apparently was involved in, addressed that

6    squarely.

7               THE COURT:  How long ago was that decision?

8               MR. FELDSTEIN:  It was 2013, your Honor.

9               THE COURT:  Okay.  Well, I think things may have

10   changed since then.

11              MR. FELDSTEIN:  The only way they have changed

12   is become more strict --

13              THE COURT:  True.

14              MR. FELDSTEIN:  In terms of what counterclaims

15   for noninfringement must be, because Form 18 is now gone,

16   and so anything that was dismissed prior to December 2015

17   ought to be dismissed now as well as additional things.

18   And so I think Senju is still relevant.  And if a claim did

19   not last in claim 13, a counterclaim of noninfringement or

20   invalidity, it won't last now either.

21              And there, the invalidity was essentially what

22   your Honor was alluding to, invalidity under one or more

23   sections of 101, 102, 103 and/or 112.  That was dismissed

24   because it does not have facts to establish a plausible

25   claim.

1              And the same thing applies to the

2    noninfringement count.  You have to have enough facts to

3    state a plausible claim.  It can't be the law that any time

4    someone, a declaratory judgment of noninfringement or no

5    trespass or whatever they come in to say you've got the

6    burden of proof and we're not even going to put in the

7    pleading what our basis is for why we contend

8    noninfringement.  We're not even going to put enough

9    facts in there to state a claim.  That isn't and can't be

10   the law.

11              THE COURT:  All right.

12              MR. FELDSTEIN:  Thank you.

13              THE COURT:  All right.  So here's what I'm going

14   to do.  I'm going to grant the Rule 12(b)(6) motion.  I'm

15   going to give you leave to amend.

16              I think that declaratory judgment of

17   noninfringement ought to say at least that here's an

18   element, a claim limitation that Sandoz's product, that

19   plaintiff cannot prove Sandoz's product meets because it

20   doesn't have X or, you know, something along those lines.

21   I'm not talking about a long song and dance here, but I'm

22   talking about something that I could see and say, yes, okay,

23   that's plausible.  And she says, or Sandoz says, we don't

24   have glycerin in our product.  That's an element of all of

25   the claims.  Okay.  You've got an issue there.  AstraZeneca

1    can respond to that.

2              And I think on the invalidity, and a lot of

3    times, you know, in a lot of patent litigation the

4    defendants don't have -- sometimes don't have much notice

5    that there's a suit.  There's a lot of reasons why it's hard

6    for them to come up and do the research that's necessary to

7    have any coherent explanation of why the patents are

8    invalid, which, of course, you certainly have the burden of

9    proof on.

10             And so I'm not saying that you can't obviously

11   amend -- I probably gave some date in the scheduling order

12   where you can amend your claims later on if necessary, but I

13   think that you need to do something more than just say,

14   they're obvious and valid for all the reasons, for all the

15   prior art cited on the face of the patent, which in some

16   ways is a very dubious way to actually raise the issue since

17   not only do you have the presumption of validity, but you

18   have the fact that those are things that we know were

19   actually considered by the Patent Office.  So maybe those

20   are the things that you are relying on.

21             So it's harder for me to say exactly what I

22   think you should have here, but I think this is entirely

23   bare bones and insufficient.  So I'm not looking for a lot,

24   but I'm looking for something more than you have.

25             Do you think you can do this in two weeks?

1          MS. RAGHAVAN:  Yes, your Honor.

2          THE COURT:  All right.  Well, then, I will say

3     that you're granted leave to amend first amended

4     counterclaims two weeks from today.  I think that resolves

5     all the issues.

6          MR. FELDSTEIN:  That's right, your Honor.

7          THE COURT:  All right.  Okay.  Well, thank you

8     very much.  I enjoyed meeting you, and I will look forward

9     to seeing you down the road.

10          MR. FELDSTEIN:  Thank you, your Honor.

11          THE COURT:  All right.

12          (Court recessed at 2:55 p.m.)

13                    -  -  -

14

15

16

17

18

19

20

21

22

23

24

25